NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| RAMADA FRANCHISE SYSTEMS, INC. | : | |
| Plaintiff, | : | Civil Action No. 03-3585 (KSH) |
| v. | : | **OPINION** |
| EAGLE HOSPITALITY GROUP, RICKY HLEAP, and ELENA EIDELMAN | : | |
| Defendants. | : | |

**KATHARINE S. HAYDEN, U.S.D.J.**

This action arises out of a franchise agreement between plaintiff Ramada Franchise Systems, Inc. ("RFS" or "plaintiff") and defendants Eagle Hospitality Group ("Eagle"), Ricky Hleap ("Hleap"), and Elena Eidelman ("Eidelman"). Hleap and Eidelman were principles of Eagle.

RFS has filed a motion for summary judgment. In opposition to the motion for summary judgment, the Court has received a Brief in Opposition and Affidavits from Hleap and Eidelman. Hleap's Affidavit states that on August 27, 2004, the U.S. Bankruptcy Court (N. D. Ga.) discharged Hleap from all obligations alleged in the lawsuit before this Court. Eidelman also filed a voluntary bankruptcy petition on April 5, 2005 in the U.S. Bankruptcy Court (S. D. Fla.). As a result of Hleap and Eidelman filing for bankruptcy, RFS' case in chief is now stayed against Hleap and Eidelman. What remains active is RFS' case against Eagle and the counterclaims of Hleap and Eidelman against RFS. It appears, then, that relief, if granted to RFS, will lie against

1

the corporate defendant only, but for ease of reference, the three named defendants will be referred to collectively as "defendants."

I.  **BACKGROUND**

In February 2001, defendants bought a 131-room guest lodging facility in Duluth, Georgia (the "Facility"), which was in financial distress, from Excelsior Hospitality, LLC. (Hleap Affid. ¶¶ 8, 10.)  As a condition to purchase, defendants agreed to continue operating the Facility as a Ramada establishment.  (Hleap Affid. ¶ 10.)  Eagle began operating the Facility on April 11, 2001.  (Hleap Affid. ¶ 5.)

RFS entered into a License Agreement with defendants for the operation of the Facility for a 15-year term.  (Cox Affid. ¶¶ 5-6; Exh. A.)  RFS argues the License Agreement was effective on or about April 10, 2001.  (Cox. Affid. ¶ 5.)  According to Eagle, when it began operating the Facility on April 11, 2001, the parties had an oral, not written agreement, which lasted until the License Agreement was signed on August 6, 2001.  (Hleap Affid. ¶ 5.) Defendants maintain that RFS promised that the Facility would receive reservations, support, training, positive brand recognition, a 60% rooms occupancy percentage, start up assistance, and access to RFS' reservation systems.  (Hleap Affid. ¶ 12.)

Defendants contend that as of April, 2001, the Facility had a poor reputation and the tour and travel business – which defendants expected and RFS promised – had vanished.  (Hleap Affid. ¶ 14.)  According to defendants, this was due to RFS' failure to pay travel agent commissions before defendants took over the Facility.  (Hleap Affid. ¶ 14.)  They assert that because these commissions were not paid, they could not "resurrect the fallen tour and travel business, a market segment that would have provided substantial revenue to the hotel."  (Hleap

Affid. ¶ 16.)  Defendants claim that these aggrieved travel agents would not book any more rooms at the Facility, and that some preexisting reservations were canceled.  (Hleap Affid. ¶ 16.)

Further, according to defendants, from the first day they took over the Facility, RFS refused to connect them to the Ramada corporate reservation system.  For weeks, defendants claim they called RFS asking to be connected to the reservation system, but RFS refused to answer and even hung up on defendants on several occasions.  Only after defendants offered to pay the previous franchisee's unpaid bill, did RFS connect them to the reservation system.  (Hleap Affid. ¶ 17.)

Defendants state that after their poor experience with RFS, they "wanted to terminate their relationship with Plaintiff during the Summer of 2001.  But by that time it was too late to remove the Ramada brand and switch to another, higher quality hotel brand.  Defendants could not afford to switch, even though they wanted to.  They had already spent all their budgeted opening capital.  So Defendants were left with two choices: sign the documents that Plaintiff presented or remove the Ramada flag from the hotel and immediately perish.  (Defendants signed the documents on or about August 6, 2001)."  (Hleap Affid. ¶ 18.)

Although defendants initially agreed when they purchased the Facility that it needed improvements, they maintain that RFS mandated more costly improvements in the License Agreement.  Defendants assert they could not immediately afford these improvements.  Eventually, defendants spent $250,000 to comply with RFS' mandate, which was a tremendous financial burden, especially in light of operating losses that cost $40,000 per month.  (Hleap Affid. ¶ 19.)

Defendants claim that RFS never mentioned that they would need to complete

expensive improvements immediately following their purchase of the Facility. In fact, defendants were "shocked" when confronted with the License Agreement because so many provisions differed so greatly from their oral agreement. For instance, they claim that RFS had agreed to waive the three meals per day requirement for the Facility's restaurant operation. Nonetheless, the License Agreement required that the restaurant operation increase from one to three meals per day. (Hleap Affid. ¶ 21.)

Shortly after the License Agreement was signed, RFS inspected the Facility and gave defendants a "D," primarily for failing to increase the restaurant's operating hours. (Hleap Affid. ¶ 22.) After the September 11th attacks, RFS waived the restaurant operation requirement. (Hleap Affid. ¶ 23.) The next year, the secured creditors foreclosed on the Facility and defendants lost everything. (Hleap Affid. ¶ 24.)

Pursuant to section 5 of the License Agreement, Eagle was obligated to operate a Ramada guest lodging facility for a 15-year term. (Cox Affid. ¶ 6; Exh. A.) In exchange, Eagle, among other things, would receive the benefit of participating in RFS's central reservations system. Section 4.2 specifically provided that Eagle would participate in the reservations system, beginning on the opening date, through the term of the agreement.

Eagle had various obligations to RFS. Pursuant to section 7 and Schedule C of the License Agreement, Eagle was required to make certain periodic payments to RFS for royalties, service assessments, taxes, interest, reservation system user fees, annual conference fees, and other fees (collectively "Recurring Fees"). (Cox Affid. ¶ 7; Exh. A.) Subsection 3.6 obligated Eagle to prepare and submit monthly reports to RFS disclosing, among other things, the amount of gross room revenue earned by Eagle at the Facility in the preceding month for purposes of

establishing the amount of royalties and other Recurring Fees due to RFS.  (Cox Affid. ¶ 8; Exh. A.)

If Eagle failed to fulfill its obligations, the License Agreement provided RFS with various remedies.  Section 11 governed default and termination.  Subsection 11.1 defined default as occurring upon Eagle's failure to pay, failure to perform, or breach of the License Agreement.  Moreover, if RFS notified Eagle of its failure to file a monthly report, pay an amount due, or maintain confidentiality obligations, and Eagle failed to cure the default within 10 days, RFS was authorized to terminate the License Agreement.  Subsection 11.1 also provided that the failure to cure any other default upon notice from RFS within 30 days was grounds for termination of the License Agreement.  (Cox Affid.; Exh. A.)

Pursuant to subsection 11.2, RFS could terminate the License Agreement, with notice to Eagle, for various reasons, including Eagle's (a) discontinued operation of the Facility as a Ramada guest lodging establishment, (b) loss of possession or the right of possession of the Facility, (c) failure to pay any amount due RFS under the License Agreement, (d) failure to remedy any other default of its obligations or warranties under the License Agreement within 30 days after receipt of written notice from RFS specifying one or more defaults under the License Agreement, and/or (e) receipt of two or more notices of default under the License Agreement in any one year period, whether or not the defaults were cured.  (Cox Affid. ¶ 9; Exh. A.)

Under subsection 12.1, Eagle agreed that, in the event of termination of the License Agreement pursuant to subsection 11.2, it would pay liquidated damages to RFS in accordance with a formula specified in the License Agreement.  (Cox Affid. ¶ 10; Exh. A.)  Section 12 is RFS' standard liquidated damages clause.  But the parties specifically negotiated subsection 18.3

of the License Agreement which capped liquidated damages for the Facility at $1,000 for each guest room that Eagle was authorized to operate at the time of termination. (Cox Affid. ¶ 11; Exh. A.) Thus, subsection 18.3 effectively reduced Eagle's maximum liquidated damages liability (before interest) from $262,000 ($2,000 x 131 rooms) to $131,000 ($1,000 x 131 rooms). (Cox Affid. ¶ 11; Exh. A.)

Subsection 7.3 of the License Agreement provided that Eagle would pay interest on any "past due amount payable to [RFS] under th[e] [License] Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid."

Section 17 covers legal matters. According to subsection 17.4, the non-prevailing party would "pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce th[e] [License] Agreement or collect amounts owed under th[e] [License] Agreement." (Cox Affid. ¶ 13; Exh. A.) Subsection 17.6.1 provided that New Jersey law would govern the construction of the License Agreement. (Cox Affid, Exh. A.) Moreover, in subsection 17.7.2, Eagle expressly disclaimed any reliance on any oral or written communications from RFS not contained in writing in the License Agreement: "Neither [RFS] nor any person acting on [RFS's] behalf has made any oral or written representation or promise to [defendants] on which [defendants] are relying to enter into this Agreement that is not written in this Agreement. [Defendants] release any claim against [RFS] or [RFS's] agents based on any oral or written representation or promise not stated in this Agreement." (Cox Affid, Exh. A.) Pursuant to subsection 17.7.3, "together with the exhibits and schedules attached, [this] is the entire agreement superseding all previous oral and written representations, agreements and

understandings of the parties about the Facility and the License." (Cox Affid, Exh. A.) In subsection 17.7.4, Eagle "acknowledge[d] that no salesperson ha[d] made any promise or provided any information to [Eagle] about projected sales, revenues, income, profits or expenses from the Facility except as stated in Item 19 of the UFOC or in a writing that is attached to th[e] [License] Agreement." (Cox Affid, Exh. A.)

Eidelman and Hleap also provided RFS with a Guaranty of Eagle's obligations under the License Agreement. (Cox Affid. ¶¶ 14-16; Exh. B.)

Eagle made an Initial Fee Note in the amount of $10,000 in connection with the License Agreement (the "Initial Fee Note"). (Cox Affid. ¶ 17; Exh. C.) The Initial Fee Note provided that the principal sum of $10,000 would be paid to RFS one year from its effective date, unless certain quality assurance conditions were met at the Facility. (Cox Affid. ¶ 18; Exh. C.) In addition, the Initial Fee Note set forth that if Eagle defaulted on its obligations, it would bear simple interest at a rate of the lessor of eighteen percent or the highest rate allowed by law. (Cox Affid. ¶ 18; Exh. C.) Moreover, if the Initial Fee Note was "collected by or through an attorney at law, [RFS] shall be entitled to collect reasonable attorneys' fees and all costs of collection." (Cox Affid. ¶ 20; Exh. C.)

Also in connection with entering into the License Agreement, Eagle assumed an Incentive Advance Note for $217,500 (the "Advance Note"). (Cox Affid. ¶ 21; Exh. E.) The Advance Note provided that on each anniversary of the Facility's opening date, one-fifteenth of the original principal amount would be forgiven without payment. (Cox Affid. ¶ 22; Exh. E.) Therefore, absent termination of the License Agreement, the obligation of defendants to repay the principal of the Advance Note would be cancelled and discharged with the principal being

completely forgiven after the 15 years. (Cox Affid. ¶ 22; Exh. E.) But if the License Agreement was terminated for any reason prior to the 15th anniversary of the Facility's opening date, the outstanding principal balance would "be immediately due and payable without further notice, demand or presentment." (Cox Affid. ¶ 23; Exh. E.) And if the outstanding principal balance was accelerated and not paid within ten days after the due date, the amount would bear simple interest at a rate of the lessor of eighteen percent or the highest rate allowed by law, and if it was collected by or through an attorney at law, RFS would "be entitled to collect reasonable attorneys' fees and all costs of collection." (Cox Affid. ¶ 24; Exh. E.)

RFS contends that beginning in 2001, Eagle defaulted on its quality assurance and financial obligations under the License Agreement, Initial Fee Note, and Advance Note. (Cox Affid. ¶ 27.) RFS inspected the Facility on September 4, 2001 and January 16, 2002 for quality assurance. (Cox Affid. ¶ 30.) By letters dated September 19, 2001 and January 30, 2002, RFS advised Eagle of failing scores on these inspections and warned that the License Agreement would be terminated if the defaults were not cured.[1] (Cox Affid. ¶ 31; Exh. I and J.) In addition, RFS advised Eagle by letters dated September 19, 2001, March 25, 2002, and August 7, 2002 that Eagle was in breach of its financial obligations and the License Agreement was subject to termination. (Cox Affid. ¶ 32; Exh. I, K and L.) On or about September 30, 2002, Eagle relinquished possession of the Facility to a third party and ceased to operate it as a Ramada guest lodging facility. (Cox Affid. ¶ 33.) Effective January 28, 2003, RFS terminated the License

---

[1] Eagle argues that it was not in default of its quality assurance obligations under the License Agreement and that RFS did not conduct inspections of the Facility on September 4, 2001 and January 16, 2002.

Agreement. (Cox Affid. ¶ 34; Exh. M.)

RFS filed its Complaint on July 30, 2003. On September 22, 2004, RFS filed for summary judgment on Counts Two (liquidated damages owed), Four (recurring fees owed), Six (breach of Guaranty), Seven (breach of Initial Fee Note), and Nine (breach of Advance Note) and on all counts asserted in defendants' Counterclaim, including those filed by Hleap and Eidelman. (Pl. Moving Br. at 11.) If summary judgment is granted in favor of RFS, RFS agrees to voluntarily dismiss the remaining counts in its Complaint. (Pl. Moving Br. at 11, n.1.) In specific terms, RFS seeks (a) $131,000 for liquidated damages; (b) $59,115 for Recurring Fees; (c) $188,500 in principal due under the Advance Note; (d) $10,000 for the balance due on the Initial Fee Note; (e) prejudgment interest; and (f) attorneys' fees and costs. (Cox Affid. ¶¶ 36-48.)

Defendants have asserted several affirmative defenses and counterclaims. In particular, defendants' claims in their Answer and Counterclaim sound in fraud, breach of oral and written promises, and breach of the implied covenant of good faith and fair dealing. However, in their opposition brief, defendants only argue breach of an oral contract and breach of the implied covenant of good faith and fair dealing. Specifically, defendants argue that the Facility did not receive a sufficient number of guest reservations from RFS' central reservation system, in breach of an oral contract. In addition, defendants contend that RFS breached its promise to provide a waiver of certain restaurant requirements, failed to provide reservation, marketing and training services, and impeded defendants' performance of their obligations under the License Agreement by falsely scoring the Facility quality assurance inspections. (Answer at Counterclaims, ¶¶ 12-27.)

9

## II. STANDARD OF REVIEW

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact" such that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)). At the summary judgment stage, the Court's "function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In so doing, the Court must construe the facts and all inferences that reasonably could be drawn therefrom in a light most favorable to the nonmoving party. Bailey v. United Airlines, 279 F.3d 194, 198 (3d Cir. 2002).

## III. DISCUSSION

In this matter, RFS is seeking payments from defendants under a franchise agreement, and defendants are arguing that RFS breached an oral agreement and the implied covenant of good faith and fair dealing. RFS asserts that these facts are parol evidence and should not be considered by the Court.

The Court determines a contract's meaning as a matter of law when its language is clear and unambiguous. See Bethlehem Steel Corp. v. United States, 270 F.3d 135, 139 (3d Cir. 2001). A contract is ambiguous if it is capable of more than one reasonable interpretation. See Pacitti by Pacitti v. Macy's, 193 F.3d 766, 773 (3d Cir. 1999) (citing Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1011 (3d Cir. 1980) (defining ambiguity as an "intellectual uncertainty [or] the condition of admitting two or more meanings, of being understood in more than one way, or referring to two or more things at the same time. . . .")). Where the contract is unambiguous and can be interpreted in only one way, the Court must interpret the contract as a

matter of law.  See Hullett v. Towers, Perrin, Forster & Crosby, Inc., 38 F.3d 107, 111 (3d Cir. 1994).

As the Third Circuit has stated, "the fundamental object in interpreting a contract is to ascertain the intent of the parties."  Allied Erecting & Dismantling Co. v. USX Corp., 249 F.3d 191, 200 (3d Cir. 2001).  Moreover, "if the parties' 'intent can be cleanly extracted from the clear and unambiguous words that the parties have used, it is equally conventional wisdom that they are held to those words contained in the contract.'"  Id. (quoting Compass Tech., Inc. v. Tseng Labs., Inc.,71 F.3d 1125 (3d Cir. 1995)).  However, to determine the parties' intentions, the Court may consider, among other things, "the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning."  Hullet, 38 F.3d at 111 (quoting Mellon Bank, 619 F.2d at 1011).

Accordingly, this Court must first determine whether the License Agreement, Initial Fee Note, and Advance Note are unambiguous and capable of only one reasonable interpretation.  See Nevets C.M. Inc. v. Nissho Iwai Am. Corp., 726 F. Supp. 525, 531 (D.N.J.), aff'd 899 F.2d 1218 (3d Cir. 1990).  Section 7 and schedule C of the License Agreement clearly required Eagle to remit Recurring Fees to RFS and subsection 3.8 required Eagle to operate the Facility in accordance with certain quality assurance standards.  Subsection 11.2 of the License Agreement unambiguously lays out when RFS could terminate the License Agreement.  Specifically, the License Agreement provided that RFS could terminate the Agreement if Eagle (a) discontinued the operation of the Facility as a Ramada guest lodging establishment, (b) lost possession or the right of possession of the Facility, (c) failed to pay any amount due RFS under the License Agreement, (d) failed to remedy any other default of its obligations or warranties under the

License Agreement within 30 days after receipt of written notice from RFS specifying one or more defaults under the License Agreement, and/or (e) received two or more notices of default under the License Agreement in any one year period, whether or not the defaults were cured. RFS argues, and this Court agrees, that the License Agreement is unambiguous.

RFS asserts that there is no genuine issue of material fact as to whether Eagle defaulted on the License Agreement. It is undisputed that Eagle lost possession of the Facility and failed to pay the Recurring Fees. This alone, even without the alleged failed quality assurance inspections, gives credence to RFS' termination of the License Agreement. In addition, Eagle does not contest the fact that it never paid the outstanding principal amounts due on the Initial Fee Note and Advance Note.

**Damages**

This Court agrees with RFS that there are no genuine issues of material fact regarding whether defendants failed to perform under the written agreements and therefore, this Court must determine damages. A clause setting forth liquidated damages is enforceable if it is "a reasonable forecast of just compensation for the harm that is caused by the breach" and "that harm is incapable or very difficult of accurate estimate." See Wasserman's v. Township of Middletown, 137 N.J. 238, 249 (1994). The New Jersey Supreme Court has stated that in "commercial transactions between parties with comparable bargaining power, stipulated damage provisions can provide a useful and efficient remedy." However, "provisions for liquidated damages are enforceable only if the amount so fixed is a reasonable forecast of just compensation for the harm that is caused by the breach." Id. at 254 (internal citations omitted). Whether a liquidated damages clause is enforceable is a question of law for the Court. Id. at 257.

RFS argues that the liquidated damages clause reasonably forecasts the provable injury resulting from a breach of the franchise agreement. Specifically, RFS contends that subsections 12.1 and 18.3 set forth a good faith estimate of the monetary damages that RFS sustains when a licensee causes the premature termination of the License Agreement. Eagle disputes this.

The parties agree that when they signed the License Agreement, it was difficult, if not impossible, to estimate the damages because of the transient lodging business, which involves daily rentals to different guests and fluctuates month to month based on several factors, including the national, regional, and local economies, the irregular travel patterns of commercial and leisure travelers, the entry or withdrawal of competitors from the market, and the effort, skill and resources of the operators. (Final Pretrial Order, ¶ 11.)

Here, the liquidated damage amount of $131,000 specified in subsection 18.3 was actually negotiated, and reduced the damages from a formula minimum of $2,000 per room to $1,000 per room. The Court will uphold the terms of subsection 18.3 and order Eagle to pay $131,000 to RFS. Eagle is also obligated to pay $59,115 to RFS for certain Recurring Fees due under the License Agreement.

In addition to the clear and unambiguous terms of the License Agreement, the Initial Fee and Advance Notes are unambiguous. The Initial Fee Note was due on April 20, 2002 and the Advance Note was due on January 28, 2003. Since both Notes have not been paid to date, the Court orders Eagle to pay the $10,000 due on the Initial Fee Note plus the $188,500 due on the Advance Note.

RFS also requests prejudgment interest at a rate of 1.5% monthly on the Liquidated Damages and Recurring Fees and the rate of 18% yearly on the Initial Fee Note and Advance

Note. In contract cases, a court exercises discretion to award prejudgment interest. <u>Emerson Radio Corp. v. Orion Sales, Inc.</u>, 253 F.3d 159, 175 (3d Cir. 2001) (quoting <u>Coastal Group, Inc. v. Dryvit Sys., Inc.</u>, 274 N.J. Super. 171, 181 (App. Div. 1994)). By contract, the parties agreed that prejudgment interest would be paid on the Liquidated Damages, Recurring Fees, and Initial and Advance Notes. Accordingly, RFS is entitled to prejudgment interest.

New Jersey law also allows attorney's fees to be recovered in breach of contract actions if the contract so provides. See North Bergen Rex. Transport, Inc. v. Trailer Leasing Co., 158 N.J. 561, 570 (1999). Subsection 17.4 of the License Agreement and the Initial Fee and Advance Notes specifically provide for attorneys' fees and costs. Therefore, RFS is entitled reasonable attorney's fees.

**<u>Defendants' counterclaims</u>**

Defendants have set forth several affirmative defenses and counterclaims in their Answer. In their opposition brief, defendants argue that RFS breached an oral agreement that existed between the parties from April 10, 2001 to August 6, 2001 and breached the implied covenant of good faith and fair dealing. Defendants do not mention any of their other counterclaims in their opposition papers. The Court will assume that defendants have abandoned their counterclaims alleging that RFS fraudulently induced them to enter into the License Agreement and that RFS acted unconscionable. Accordingly, this Court will only address the oral agreement and implied covenant of good faith and fair dealing claims.

RFS interprets defendants' arguments regarding a prior oral agreement as an attempt to offset exposure to damages, not as a defense to their liability under the License Agreement, Initial Fee Note, and Advance Note. Moreover, RFS contends that "any such offset would be

14

minimal, given the short time (four months) of the alleged oral agreement." (RFS Reply Br. at 2.) In addition, RFS maintains that defendants knowingly released RFS from any such claims and RFS did not violate any contractual promises. Id. at 3.

The Court must first examine whether it should consider evidence of the parties' prior oral communications. "The parol evidence rule prohibits the introduction of oral promises to alter or vary an integrated written instrument." Travelodge Hotels, Inc. v. Honeysuckle Enters., 357 F. Supp. 2d 788, 795 (D.N.J. 2005) (internal quotations omitted). However, New Jersey law[2] does not prohibit the introduction of parol evidence in an action based on fraud. But, here, defendants do not argue fraud in their opposition papers.

At issue between the parties is whether the express integration clauses and releases contained in the written agreements between the parties apply to the earlier oral agreement. An express integration clause is contained in the License Agreement: subsection 17.7.3 states that the License Agreement, "together with the exhibits and schedules attached, is the entire agreement superseding all previous oral and written representations, agreements and understandings of the parties about the Facility and the License." (Cox Affid, Exh. A.) Defendants argue that this express integration clause has no bearing upon the earlier oral agreement because it only applies to the parties' future duties from the date of signing the written agreement onward. (Def. Oppos. Br. at 6.) Moreover, defendants contend the agreements between the parties "were written to be executed by licensees before they began operating a Ramada flag, not for licensees like Defendants who had been operating with a Ramada flag for

---

[2] A choice of law provision in the License Agreement indicates that New Jersey law shall govern.

15

four months." Id.  Therefore, according to defendants, the oral agreement is admissible to interpret the parties written, integrated agreements.

RFS relies on the express integration clause contained in the License Agreement, along with express releases signed by defendants on three separate occasion.  The first occasion occurred where when Hleap signed the License Agreement on behalf of Eagle.  Subsection 17.7.2 of the License Agreement states that "Neither [RFS] nor any person acting on [its] behalf has made any oral or written representation or promise to [defendants] on which [defendants] are relying to enter into th[e] [License] Agreement that is not written in th[e] [License] Agreement. [Defendants] release any claim against [RFS] or [its] agents based on any oral or written representation or promise not stated in this Agreement."  (Cox Affid, Exh. A.)  This disclaimer specifically mentions "*any* claim against [RFS] . . . based on *any* oral . . . promise not stated in this Agreement." Id. (emphasis added).  Moreover, subsection 17.7.4 of the License Agreement provides that "no salesperson ha[d] made any promise or provided any information to [Defendants] about projected sales, revenues, income, profits or expenses from the Facility except as stated in Item 19 of the UFOC or in a writing that is attached to this Agreement."

The second release event is a letter agreement between the parties signed by Hleap on behalf of himself and Eagle on October 10, 2001.  (Cox Supp. Affid., Exh. A.)  The letter agreement contained a release stating in relevant part:

> Franchisee [Eagle], on behalf of itself, its partners, officers, employees, directors, shareholders, and guarantors of the [License] Agreement . . .  hereby release and hold harmless the Company [RFS] . . . from any and all liability, claims, damages, and causes of action arising out of the offer, sale, negotiations, administration, default, or any and all cause of action against such parties related to the [License] Agreement or the Facility, which arose and were or could have been asserted by Franchisee [Eagle] prior to the execution of this [letter] [a]greement.

16

Id.

The third release event is another letter agreement between the parties signed by Hleap and Eidelman on behalf of Eagle on April 8 and 10, 2002, which contains the same language. (Cox Supp. Affid., Exh. B.) The Court notes that both letter agreements were signed long after the factual scenario underlying the alleged oral agreement arose.

Although New Jersey law does not prohibit the introduction of parol evidence in an action based on fraud, defendants do not argue fraud in their opposition papers. Rather, defendants are attempting to bring in parol evidence to excuse liability under an integrated written instrument. See Filmlife, Inc. v. Mal "Z" Ena, Inc., 251 N.J. Super. 570 (App. Div. 1991); Ocean Cape Hotel Corp. v. Masefield Corp., 63 N.J. Super. 369 (App. Div. 1960). The Court agrees with RFS and finds that the parol evidence rule bars evidence of the prior oral communications between the parties. The Court makes this determination based upon the express integration clause contained in the License Agreement and the three express disclaimers signed by defendants on three separate occasions. The Court disagrees with defendants that the express integration clause only applies to the parties' future duties from the signing of the written agreement onward. The plain language of the integration clause states that the License Agreement supersedes all *previous* oral and written representations. Moreover, nothing in the record supports defendants' proposition that the agreements between the parties were written for licensees who had never operated a Ramada flag. Defendants do not claim fraud in their opposition, or offer any evidence of fraudulent conduct. The Court holds that the written agreements between the parties are binding and the evidence of contrary prior oral communications cannot be considered.

Defendants argue that RFS breached its duty of good faith and fair dealing that was part of the oral agreement when it refused to provide reservation services promptly, and refused to pay travel agent commissions.  But such obligations flow from the oral agreement that defendants have asserted and the Court has rejected as a basis for their counterclaims.

Even assuming wrongs were committed by RFS, these do not excuse defendants' non-payment of required fees.  See McDonald's Corp. v. Robert A. Makin, Inc., 653 F. Supp. 401, 403 (W.D.N.Y. 1986) (stating that the defendants' counterclaims will be adjudicated in their own right, but the "alleged wrongs of plaintiff do not constitute affirmative defenses to defendants' non-payment of franchise fees").  As the Third Circuit has stated, "When one party to a contract feels that the other contracting party has breached its agreement, the non-breaching party may either stop performance and assume the contract is avoided, or continue its performance and sue for damages.  Under no circumstances may the non-breaching party stop performance and continue to take advantage of the contract's benefits. Other courts have noted this exact dilemma in resolving franchise termination disputes." S&R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 376 (3d Cir. 1992).  It should be noted that while defendants argue RFS breached an oral agreement and the implied covenant of good faith and fair dealing, they do not contend that their performance was excused by a material breach by RFS of any of the written agreements.

## **CONCLUSION**

For the foregoing reasons, RFS' motion for summary judgment is **granted**.

Dated: June 24, 2005                                         s/ Katharine S. Hayden
                                                                         Katharine S. Hayden, U.S.D.J.